**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ORIGIN, INC., <br><br> Plaintiff, <br><br> v. <br><br> MAGID FINANCIAL SERVICES INC., and JOSEPH MAGID, <br><br> Defendants. | Civil Action No. 19-14435 (GC) (DEA) <br><br> **MEMORANDUM OPINION** |

CASTNER, District Judge

**THIS MATTER** comes before the Court upon Plaintiff Origin, Inc.'s Motion for Partial Summary Judgment on Counts One and Two of the Complaint. (*See* ECF No. 38.) Defendants Magid Financial Services Inc. and Joseph Magid opposed (*see* ECF No. 46), and Plaintiff replied (*see* ECF No. 53). The Court has carefully considered the parties' submissions, and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons set forth herein, and other good cause shown, Plaintiff's Motion for Partial Summary Judgment is **GRANTED** in part and **DENIED** in part.

I.   **BACKGROUND**[1]

   A.   **Procedural Background**

This case involves a contractual dispute stemming from a pair of subscription agreements entered into in 2017 and 2018.

On June 28, 2019, Plaintiff Origin, Inc. ("Plaintiff" or "Origin"), a Delaware corporation with its principal place of business in Princeton, New Jersey, brought suit against Defendants Magid Financial Services Inc. ("MFS"), a Pennsylvania corporation with its principal place of business in Pennsylvania, and Joseph Magid ("Magid"), a resident of Pennsylvania.[2] (ECF No. 1 ¶¶ 1-4.) On August 14, 2020, Defendants answered the Complaint and asserted affirmative defenses.[3] (*See* ECF No. 16.)

Origin is a privately-held, clinical-stage biotechnology company that has been trying to become an active participant in the plasma-medicine arena. (ECF No. 1 ¶¶ 9-10.) Origin alleges that it entered into a pair of subscriptions agreements with MFS, through which MFS agreed to pay more than seven million dollars to purchase common stock in Origin, which was expected to help with Origin's growth. (*Id.* ¶¶ 11-15.)

MFS allegedy never performed on the subscription agreements, and Origin asserts claims

---

[1]   On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[2]   This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

[3]   Before answering, Magid *pro se* filed on August 27, 2019, a Notice of Preliminary Objections, which was stricken by the Court for not complying with the Federal Rules of Civil Procedure. (ECF Nos. 7 & 8.) A *pro se* motion to dismiss was then filed on Defendants' behalf on October 2, 2019, but Defendants subsequently retained counsel, who wrote to inform the Court that Defendants would no longer be pursuing a motion to dismiss but, instead, would be answering the Complaint. (ECF No. 14.)

for breach of contract, specific performance, as well as fraud and misrepresentation. (*Id.* ¶¶ 70-113.)

Following discovery, Origin moved on March 11, 2022, for partial summary judgment pursuant to Rule 56, asking the Court to grant judgment on liability and damages in Origin's favor on its first and second causes of action for breach of contract. (ECF No. 38.) On April 29, 2022, Defendants opposed the motion. (ECF No. 46.) Origin replied on May 9, 2022. (ECF No. 53.)

### B.     Undisputed Facts[4]

Starting in 2014, Origin began raising capital through the sale of equity or debt securities. (SMF & RSMF ¶ 3.)

MFS, which provides tax and accounting services and whose sole principal and employee is Magid (a certified public accountant), entered into a December 20, 2017 Subscription Agreement ("2017 Subscription Agreement") with Origin. (SMF & RSMF ¶¶ 2, 4; ECF No. 39-1 at 1-13.[5]) According to the 2017 Subscription Agreement, MFS agreed to purchase 2,035 shares in Origin at $1,400.00 per share for a total of $2,850,000.00.[6] (SMF & RSMF ¶ 4; ECF No. 39-1 at 12.) Approximately six months later, MFS entered into a June 11, 2018 Subscription Agreement ("2018 Subscription Agreement") with Origin, wherein MFS agreed to purchase 3,143 shares at $1,400.00 per share for a gross total of $4,400,200.00 ($3,960,180.00 net). (SMF & RSMF ¶ 5;

---

[4]     Plaintiff's Statement of Material Facts ("SMF") is at ECF No. 41; Defendants' Response to Plaintiff's Statement of Material Facts ("RSMF") is at ECF No. 48; Defendants' Supplemental Statement of Material Facts ("SSMF") is at ECF No. 49; and Plaintiff's Response to Defendants' Supplemental Statement of Material Facts ("RSSMF") is at ECF No. 51.

[5]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[6]     There appears to be a slight discrepancy between the per-share price and the total price stated in the 2017 Subscription Agreement.

3

ECF No. 39-2 at 1-13.) Both agreements are signed by Magid on behalf of MFS, and they contain choice-of-law provisions that state that the agreements will be governed by Delaware law. (SMF & RSMF ¶ 12; ECF No. 39-1 at 10, 12; ECF No. 39-2 at 10, 12.)

According to both Subscription Agreements, MFS was obligated to pay the respective purchase prices at the time of execution and delivery of the agreements. (SMF & RSMF ¶ 6; ECF No. 39-1 at 3; ECF No. 39-2 at 3.) Further, Section 1(a)(i) of both agreements states that, "[u]pon execution . . . , the Subscriber's obligation to purchase the Purchased Shares shall be irrevocable . . . ." (SMF & RSMF ¶ 7; ECF No. 39-1 at 1; ECF No. 39-2 at 1.) MFS never paid the purchase prices under either the 2017 Subscription Agreement or the 2018 Subscription Agreement. (SMF & RSMF ¶ 17.)

The Subscription Agreements contain other representations and warranties. Section 2 states that MFS "has all requisite legal and other power and authority . . . to carry out and perform Subscriber's obligations under the terms of" the agreements, and "has independently determined that this investment and the transactions contemplated . . . are a suitable investment for the Subscriber." (SMF & RSMF ¶ 8; ECF No. 39-1 at 5; ECF No. 39-2 at 5.) Section 5(k) states that MFS "had the opportunity to consult with [its] own attorney and other advisors . . . and Subscriber has done so to the extent that Subscriber deems appropriate." (SMF & RSMF ¶ 9; ECF No. 39-1 at 11; ECF No 39-2 at 11.) MFS agreed to indemnify and hold Origin harmless against "any material misrepresentation by Subscriber or breach of any representation or warranty . . . [or] any breach or default in performance by Subscriber." (SMF & RSMF ¶ 10; ECF No. 39-1 at 9; ECF No. 39-2 at 9.) The agreements also state that they "shall not be construed for or against a party based upon authorship." (ECF No. 39-1 at 11; ECF No. 39-2 at 11.)

Section 5(b) of the agreements contain the same integration clause that states:

4

> Entire Agreement; Assignment. This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof, superseding all prior or contemporaneous agreements, understandings or promises between the parties hereto. This Agreement may be terminated, modified, waived, or amended only by a writing executed and delivered by both parties. Neither the Company nor Subscriber has relied on any representations not contained or referred to in this Agreement. No right or obligation of a party shall be assigned or otherwise transferred without prior notice to and the written consent of the other party. Any assignment or transfer in violation of the foregoing shall be null and void.

[(SMF & RSMF ¶ 11; ECF No. 39-1 at 10; ECF No. 39-2 at 10.)]

In October 2018, about four months after the parties entered into the 2018 Subscription Agreement, MFS proposed a new funding arrangement: MFS would lend Origin $4,400,000.00 in lieu of MFS outright purchasing Origin's shares pursuant to the Subscription Agreements. (SMF & RSMF ¶ 13.) This proposal was recorded on MFS letterhead in a single-paged October 22, 2018 "Letter of Intend" (hereinafter, "Letter of Intent"), signed by Magid as "President" of MFS and Michael Preston as "Chairman and CEO" of Origin. (SMF & RSMF ¶ 14; SSMF & RSSMF ¶ 12; ECF No. 39-3 at 1.)

Paragraph 1 of the Letter of Intent states that MFS intended to invest $4,400,000.00 "[f]or the purpose of future development of Origin . . . products benefiting research, and cure of Diabetes and . . . complications." (ECF No. 39-3 at 1.) Paragraph 4 states that "[r]epayment will be as to $400,000 . . . in cash, and . . . $4,000,000.00 by issuance in shares." (*Id.*) Paragraph 5 states that, "[u]pon transfer of the funds to . . . Origin . . . , all previous agreements between Origin . . . and [MFS] will be null and void." (SMF & RSMF ¶ 15; ECF No. 39-3 at 1.)

MFS did not transfer to Origin the $4,400,000.00 set forth in the Letter of Intent. (SMF & RSMF ¶ 16.)

## II.     LEGAL STANDARD

### A.     Federal Rule of Civil Procedure 56: Summary Judgment

Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.,* 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.,* 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

## III.    DISCUSSION

### A.     Counts One and Two: Breach of Contract

Plaintiff Origin seeks summary judgment on Counts One and Two of the Complaint for breach of contract. (ECF No. 1 ¶¶ 70-83.) Count One is for alleged breach of the 2017 Subscription Agreement, and Count Two is for alleged breach of the 2018 Subscription Agreement. (*Id.*) Origin contends that MFS materially breached these valid and enforceable agreements by failing to pay the promised price in exchange for the agreed-upon number of shares, and Origin has "suffered damages in an amount to be determined at trial." (*Id.* ¶¶ 76, 83.)

In its motion papers, Origin argues that this is "a simple breach of contract matter," because the two Subscription Agreements are "clear and unambiguous," and they are "integrated agreements which contain unambiguous merger clauses precluding the reliance on any extrinsic evidence or prior agreements or understandings between the parties." (ECF No. 42 at 4, 10-16.)

Origin maintains that, "[t]ogether, the Subscription Agreements obligated . . . MFS to pay Origin the total amount of $7,250,000.00." (*Id.* at 18.)

In opposition, Defendants argue that "what the parties mutually understood and agreed upon went well beyond the plain terms of the Subscription Agreements," namely, "Magid's obligation to acquire shares in Origin would only become irrevocable once Magid received the means to do so," which allegedly required a "third-party trading platform" to first perform. (ECF No. 50 at 4, 9-13.) Further, Defendants insist that the Letter of Intent abrogated the earlier Subscription Agreements, because "[a]t the time of . . . [the Letter of Intent], both parties once again accepted and understood this loan was contingent upon the performance of a trading platform." (*Id.* at 7.) Finally, Defendants argue that they "cannot be held liable for the 2017 Subscription Agreement because it was superseded by the 2018 Subscription Agreement. At no point was there any discussion between the parties that Magid would purchase over seven million dollars in Origin shares." (*Id.* at 14.)

Under Delaware law,[7] "[a]bsent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the[ir] agreement, construing the agreement as a whole and giving effect to all its provisions." *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 759 (Del. Ch. 2023) (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)). "If a writing

---

[7]   In their briefs, both parties rely on the substantive contract law of Delaware for interpretation and enforcement of the Subscription Agreements. (*See* ECF No. 42 at 9; ECF No. 50 at 8.) Recognizing that both agreements contain choice-of-law provisions that select Delaware law, this Court will also apply the law of the State of Delaware to the breach-of-contract claims. *See Chen v. Wang*, Civ. No. 22-4708, 2023 WL 3182264, at *5 n.4 (D.N.J. Apr. 30, 2023) ("With respect to the controlling law, the parties do not dispute that Counts I and III are governed by Delaware law pursuant to the choice-of-law clause . . . . 'Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy.'" (quoting *Networld Commc'ns, Corp. v. Croatia Airlines, D.D.*, Civ. No. 13-4770, 2014 WL 4662223, at *2 (D.N.J. Sept. 18, 2014))).

is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *Id.* (quoting *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

"If the language of an agreement is ambiguous, then the court 'may consider extrinsic evidence to resolve the ambiguity.'" *Id.* (quoting *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014)). However, a contract "is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Id.* (quoting *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012)).

Moreover, an agreement's "integration clause should be interpreted according to its 'plain meaning when its terms are unambiguous.'" *Id.* at 760 (quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013)). "When a 'subsequent agreement' contains a valid integration clause, it 'supersedes' the terms of any prior agreement covering the same subject matter." *Id.* (citing *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *11 (Del. Ch. Dec. 16, 2015)). And "[w]hen a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement 'need[s] to be memorialized in [the subsequent agreement]' to survive."[8] *Id.* (quoting *Hunt v. Limestone Medical Properties, LLC*, 2018 WL 2939441, at *4 (Del. Ch. June 11, 2018)).

In the present case, Defendants do not point to any specific provision in the Subscription Agreements that they contend is ambiguous, to wit, which is reasonably susceptible to more than one meaning; instead, they admit that the agreements set forth what MFS was required to pay in

---

[8] *See also FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 858 (Del. Ch.), *aff'd sub nom.*, 148 A.3d 1171 (Del. 2016) ("Delaware law enforces clauses which identify the specific information on which a party has relied and foreclose reliance on other information.").

8

exchange for a specific number of shares. (SMF & RSMF ¶ 4 ("[Fact:] Pursuant to the December 20, 2017 Subscription Agreement, MFS agreed to purchase 2[,]035 shares for an aggregate purchase price of $2,850,000.00. [Response:] Undisputed . . . ."); *id.* ¶ 5 ("[Fact:] Pursuant to the June 11, 2018 Subscription Agreement, MFS agreed to purchase 3,143 shares for a purchase price of $4,400,200.00. [Response:] Undisputed . . . .").)

Defendants initially ask this Court to look beyond the four corners of the Subscription Agreements to extrinsic evidence that, they argue, supports the conclusion that the parties "understood [that] Magid's obligation to acquire shares in Origin would only become irrevocable once Magid received the means to do so." (ECF No. 50 at 4.) Defendants ask the Court to do this even though the Subscription Agreements state that the agreements would become irrevocable "[u]pon execution"; that each agreement "represents the entire agreement between the parties hereto with respect to the subject matter hereof, superseding all prior or contemporaneous agreements, understandings or promises between the parties hereto"; and that "[n]either . . . [party] has relied on any representations not contained or referred to in" the Subscription Agreements. (SMF & RSMF ¶¶ 7, 11; ECF No. 39-1 at 1, 10; ECF No. 39-2 at 1, 10.) The Court cannot do so.

When the parties entered into unambiguous Subscription Agreements with unambiguous merger/integration clauses, they manifested a clear intent to be bound by those agreements. The Court cannot now graft onto the Subscription Agreements a condition not included therein by the parties themselves. Defendants' contention that the parties understood that the Subscription Agreements would remain revocable unless and until Defendants obtained certain funds from "a third-party trading platform, for which Magid had no control over," (*see* ECF No. 50 at 9), is belied by the express terms of the Subscription Agreements that Magid executed on behalf of MFS in 2017 and 2018.

9

The case law cited by Defendants does not support a contrary finding. In *Carlson v. Hallinan*, for example, the court found the written agreement "partially integrated" and considered prior oral agreements related to compensation of executives when the written agreement at issue did "not address executive compensation at all" and it was "admitted that the [oral] agreement on [executive] compensation survived the execution of the" written agreement. 925 A.2d 506, 522-23 (Del. Ch. 2006), *opinion clarified*, 2006 WL 1510759 (Del. Ch. May 22, 2006). Here, by contrast, the Subscription Agreements squarely address when MFS's obligations to pay would become irrevocable ("[u]pon execution") and the amount that would be due by MFS, and contain a broad integration clause stating that the Subscription Agreements represent the parties' entire agreement on the subject at that time. *See id.* at 523 ("The presence of an integration clause in a contract is 'a clear sign that the writing is meant to be [the parties' entire agreement]' and 'make[s] the parol evidence rule particularly applicable.'" (quoting *McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (Pa. Super. 1987), *aff'd*, 548 A.2d 1223 (Pa. 1988))).

The other opinions cited by Defendants are no more persuasive for their position than *Carlson*. Ultimately, when a written agreement is unambiguous, fully integrated, and addresses the relevant subject matter, there is little basis under Delaware law for looking beyond the written agreement unless fraud or some other form of bad faith or unconscionability is alleged. *See, e.g.*, *SARN Energy LLC v. Tatra Defence Vehicle as*, 2018 WL 5794599, at *9 (Del. Super. Ct. Nov. 5, 2018) (on motion to dismiss, determining that an agreement "could be partially integrated" when it was three pages and did not contain an integration clause and underscoring that "[p]arol evidence is permitted in the face of a fully integrated contract to clarify ambiguous contract language or when the contract is a product of fraud or misrepresentation"); *Gay v. Delmarva Pole Bldg. Supply, Inc.*, 2008 WL 2943400, at *6 (Del. Super. Ct. July 18, 2008) ("[U]nder the foregoing clause, Gay

contractually promised that no reliance was made on statements outside of the contract. He is bound thereby unless there was fraud.").

Even if the Court was inclined to view the Subscription Agreements as either ambiguous or partially integrated, the extrinsic evidence submitted by Defendants does not provide convincing support for the inference that the parties intended the Subscription Agreements' terms to be wholly contingent (*i.e.*, indefinitely revocable) upon Magid obtaining funds from a third-party trading platform.

In his certification, Magid writes that he informed Origin in 2017 that his "purchase of these shares was contingent upon the performance of a third-party platform with which [he] had invested money," but Magid does not cite to any document or communication substantiating this self-serving assertion. (ECF No. 47 at 2 ¶ 4.) Magid then writes that prior to signing the 2018 Subscription Agreement, he informed Origin "in a May 2, 2018 letter that performance of the underlying agreement was dependent on generating a large fund from the existence of these trading platforms." (*Id.* at 4 ¶ 15(b).) The May 2, 2018 letter from Magid, dated a little over a month before the 2018 Subscription Agreement was executed, does not state that any subsequent written agreement could be canceled at will by Magid or that a later agreement would be conditioned only upon the performance of a third-party trading platform. Rather, in the letter, Magid appears to be trying to comfort Origin's officers as to MFS's reliability, writing that Magid had communicated with his "Platform-Trader" and obtained "a clearer idea on . . . fund availability." (ECF No. 47-5 at 1.) According to Magid, he had been "reassured" that his funds would be available by "no later than June 8th." (*Id.*)

Although the May 2, 2018 letter (and other communications) may have been enough to put Origin on notice that the funds Magid intended to use to purchase shares in Origin would be

11

coming from a third-party, it does not establish that the parties ever intended that any agreement between them would be dependent on a third-party's ability to perform. In any event, if Magid had harbored doubt in June 2018 (more than a month after the May 2, 2018 letter) whether he would be able to obtain the funds pledged to purchase shares from Origin, he could have chosen not to enter into an agreement on behalf of MFS wherein it agreed and represented, among other things, that the obligation to perform would become irrevocable upon execution of the agreement. Such express terms cannot be so lightly disavowed. *See Pellaton v. Bank of New York*, 592 A.2d 473, 477 (Del. 1991) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not . . . know what it contained. If this were permitted, contracts would not be worth the paper on which they are written." (quoting *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875))).

Defendants next argue that, even if the Subscription Agreements are enforceable, the Court should hold that the Letter of Intent modified them or rendered them null and void. (ECF No. 50 at 10-11.) The Court cannot do so.

Although both Subscription Agreements state that the agreements "may be terminated, modified, waived, or amended . . . by a writing executed and delivered by both parties," (*see* SMF & RSMF ¶ 11; ECF No. 39-1 at 10; ECF No. 39-2 at 10), the Letter of Intent sets forth that "all previous agreements between Origin . . . and [MFS] will be null and void" only "[u]pon transfer of the funds to . . . Origin."[9] (SMF & RSMF ¶ 15; ECF No. 39-3 at 1.) Because it is undisputed that MFS did not transfer to Origin the $4,400,000.00 proposed in the Letter of Intent, (SMF & RSMF ¶ 16), the condition necessary for the Letter of Intent to nullify the earlier Subscription

---

[9]    Magid testified during his deposition that he prepared the Letter of Intent and did not discuss it with anyone at Origin before presenting it on his letterhead. (ECF No. 52-1 at 5-7.)

12

Agreements did not take place. *See Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. Ct. July 29, 2021) ("An unexcused and unsatisfied condition keeps a dependent duty from accruing . . . ." (citing *Lennox Indus. Inc. v. All. Compressors LLC*, 2020 WL 4596840, at *3 (Del. Super. Ct. Aug. 10, 2020))). As a result, Defendants cannot now rely on the Letter of Intent to modify their obligations under to the Subscription Agreements when they admit that they did not satisfy the agreed-upon condition for nullifying the Subscription Agreements.

Defendants' final argument is that they cannot be held liable under both the 2017 and 2018 Subscriptions Agreements. (ECF No. 50 at 14.) Relying on similar arguments as those advanced by Origin, Defendants submit that the integration clause in the 2018 Subscription Agreement "precludes the possibility of [the 2017 Subscription Agreement] being enforced, because" the 2017 Subscription Agreement was modified "by the 2018 Subscription Agreement." (*Id.*; *see also* ECF No. 47 at 2 ¶ 8 ("Magid: The execution of the Second Subscription Agreement was intended to replace the first Subscription Agreement, and at no point in time was it discussed or agreed upon that I would be purchasing . . . $7,249,200.00[] worth of shares.").) In its reply, Origin did not respond to Defendants' argument on this point. (*See* ECF No. 53.) Origin also did not highlight any extrinsic evidence that touched on this issue. (*See* ECF Nos. 39 & 40.)

The integration clause in the 2018 Subscription Agreement states that it "represents the entire agreement between the parties hereto with respect to the subject matter hereof, superseding *all prior* or contemporaneous agreements, understandings or promises between the parties hereto." (ECF No. 39-2 at 10 (emphasis added).) Nowhere does the 2018 Subscription Agreement reference the 2017 Subscription Agreement. Nor does the 2018 Subscription Agreement state that it intends to be additive, that is, the parties do not state that they envision the purchase of 3,143

13

shares in 2018 to be in addition to the 2,035 shares anticipated to be purchased by the 2017 Subscription Agreement.[10]

In view of the unambiguous integration clause in the 2018 Subscription Agreement and the absence of evidence that the parties intended to save the 2017 Subscription Agreement when they entered into the 2018 Subscription Agreement, the Court finds that the 2018 agreement supersedes the earlier 2017 agreement, and Origin's claim for breach of the 2017 Subscription Agreement fails as a result. *See Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 823 (Del. Ch. 2020) ("When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement 'need[s] to be memorialized in [the subsequent agreement]' to survive." (quoting *Hunt*, 2018 WL 2939441, at *4)). Origin itself emphasized the importance of the integration clause when Origin wrote that the clause is "no throwaway provision," and the provision "plainly memorialize[s] the intent of the parties to the Subscription Agreement that it supersedes all prior or contemporaneous understandings or promises between the parties." (ECF No. 53 at 4.)

Accordingly, based on the undisputed material facts, the Court holds that Origin has established that Defendants breached the 2018 Subscription Agreement, and the Court grants Plaintiff summary judgment as to Defendants' liability on Count Two of the Complaint. As to the 2017 Subscription Agreement, the Court holds that the same evidence supports the finding that this agreement was superseded by the 2018 Subscription Agreement, and the Court denies summary judgment on Count One of the Complaint and dismisses the claim.

Origin also asked the Court to enter an award of damages at this stage, but the briefing as

---

[10] The Court also notes that the later Letter of Intent anticipated Defendants providing a loan of $4,400,000.00, not $7,250,000.00. (ECF No. 39-3 at 1.)

to the nature and calculation of damages was very sparse. (*See* ECF No. 42 at 17-18.) The Court does not believe it appropriate to award damages with such limited argument presented, and it will thus deny summary judgment without prejudice on the issue of the calculation of damages for Defendants' breach of the 2018 Subscription Agreement (Count Two). A briefing schedule will be set on this issue so that the parties can present more detailed argument as to how damages should be calculated here (and the nature of those damages) and whether it is appropriate for the Court to so order on summary judgment. *See, e.g.*, *Williams v. UHV Techs., Inc.*, Civ. No. 03-1158, 2005 WL 8176021, at *15 (D.N.J. Mar. 23, 2005) (Wolfson, C.J.) (denying without prejudice motion for summary judgment and directing the parties to submit additional briefing).

### IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, Plaintiff's Motion for Partial Summary Judgment (*see* ECF No. 38) is **GRANTED** in part and **DENIED** in part. An appropriate Order follows.

Dated: May 31, 2023

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE